UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRANDON ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:15-cv-00925-RLY-TAB |
| | ) | |
| BARTHOLOMEW COUNTY COURT | ) | |
| SERVICES DEPARTMENT, | ) | |
| BRADFORD BARNES, in his official | ) | |
| capacity as the Director of Bartholomew | ) | |
| County Court Services Department, | ) | |
| BARTHOLOMEW COUNTY YOUTH | ) | |
| SERVICES DEPARTMENT, and ANITA | ) | |
| BIEHLE, in her official capacity as the | ) | |
| Director of the Bartholomew County Youth | ) | |
| Services Department, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Brandon Allen, filed this lawsuit for declaratory relief, injunctive relief, and damages against Defendants, Bartholomew County Court Services Department, Bradford Barnes, in his official capacity as the Director of the Bartholomew County Court Services Department, Bartholomew County Youth Services Department, and Anita Biehle, in her official capacity as the Director of the Bartholomew County Youth Services Department.  Plaintiff, a Court Services employee, asserts that Defendants' written policy prohibiting employees from engaging in "political activity" runs afoul of the First Amendment to the U.S. Constitution, Article 1, Section 9 of the Indiana Constitution, and Indiana Code § 33-23-12-3.  This matter now comes before the court on

Plaintiff's Motion for Preliminary Injunction.[1]  For the reasons set forth below, the court **GRANTS** Plaintiff's motion.

## I. Background

Plaintiff has been employed by Bartholomew County Youth Services since 2007. (Filing No. 1, Complaint ¶ 7; Filing No. 7, Answer ¶ 7).  Youth Services operates the juvenile detention center in Bartholomew County, Indiana.  (*Id.*).  Defendant Anita Biehle is the Director of Youth Services.  (*Id.* ¶ 4).  From 1992 until January 1, 2013, Youth Services was a stand-alone department of Bartholomew County.  (*Id.*).  Effective January 1, 2013, Youth Services became a sub-department of Bartholomew County Court Services, which is under the direction of the Bartholomew County Board of Judges.  (*Id.* ¶¶ 3-4).  The Director of Court Services is Defendant Bradford Barnes.  (*Id.* ¶ 3).  Court Services oversees the adult probation system, community corrections, and the drug and alcohol treatment program.  (*Id.*).

Plaintiff works as a Control Officer, and his job is part secretary and part security guard.  (Filing No. 24-1, Affidavit of Plaintiff ¶ 4).  While technically an employee of the state judiciary, Plaintiff does not perform any judicial functions, appear in the courtroom, interact with the public on the judges' behalf, or regularly communicate with judges.  (*Id.* ¶ 5; Compl. ¶ 8; Ans. ¶¶ 3, 8).

---

[1] Neither party requested that the court hold an evidentiary hearing, and, after reading the arguments of counsel, the court finds that a hearing is unnecessary.  *See Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002) ("An evidentiary hearing is required if the nonmoving party raises genuine issues of material fact in response to a motion for a preliminary injunction.").

Plaintiff has been interested and active in politics for many years.  He has run for public office, "worked the polls" on Election Day, and volunteered for, worked on, and donated money to many political campaigns.  (Plaintiff Aff. ¶¶ 8-9).  In June 2012, Plaintiff, along with some partners, created a political consulting firm named SocialWorks, LLC.  (Compl. ¶ 10).  Plaintiff has between a 40-80% stake in SocialWorks.  (*Id.*).

Before Youth Services was merged with Court Services, the only restriction on Youth Services employees' participation in political activity was that it not interfere with their job or occur during work time.  (Compl. & Ans. ¶ 12).  After the merger, Youth Services employees became subject to the Court Services Employee Handbook.  (*Id.* ¶ 13; Filing No. 24-2).  The Employee Handbook contains a provision that states, in relevant part, "A Court Services' employee retains the right to vote but shall not otherwise participate in political activity.  Excepting [sic] Judges seeking re-election, no Court employee shall be a candidate for or hold a full-time elective office" (the "Policy").  (Compl. & Ans. ¶ 14; Filing No. 24-3, Employee Handbook at 22).  The Employee Handbook further provides that a Court Services employee who "knowingly violates these rules or fails to report a violation shall be subject to discipline, up to and including immediate termination."  (Employee Handbook at 23).

On November 16, 2012, Plaintiff asked Biehle for clarification of the Policy via e-mail, stating:

> I am concerned because [the Policy] appears to restrict my right to things like, letters to the editor, yard signs, political fund-raisers, advocacy for or signing school/tax referendums, registering voters, volunteering, signing

> candidacy petitions, wearing buttons/clothing/bumper stickers, making phone calls, baking food for a pitch-in, running for state/national delegate, working the polls, running for/holding party office, and many other expressions of free speech outside of my workplace.

(Filing No. 24-2). Biehle responded, "I will have to look at it again, but I do know that this is something that changed." (*Id.*). Plaintiff did not receive any other substantive response to this e-mail. He also made several verbal attempts to obtain clarification of the Policy, but no clarification was ever offered. (Compl. & Ans. ¶ 17). Because Plaintiff was concerned about being terminated for violating the Policy, he resigned his position as precinct chairman and abstained from engaging in any form of activity that could reasonably be considered "political." (Plaintiff Aff. ¶ 16). For example, Plaintiff removed himself from political e-mail list-serves and deleted all political posts from his Facebook page. He also refrained from making donations to candidates, volunteering for campaigns, writing letters to the editor, attending public meetings, displaying yard signs, discussing politics at public events, placing bumper stickers on his vehicle, and "liking" politically-themed content on Facebook. (*Id.*).

On January 13, 2014, Plaintiff sent another e-mail to Biehle, asking whether he could pursue outside employment with a political consulting firm. (Filing No. 24-5). He also asked for further clarification of the Policy on matters unrelated to outside employment. Specifically, Plaintiff inquired whether he was able to run for state delegate or precinct chair, "work the polls" on Election Day, or make donations. (*Id.*). On January 31, 2014, Biehle shared Barnes' response with Plaintiff. Barnes wrote, "Brandon can work the polls if that means thru [sic] the official duty with the clerk's office. If he is

4

politicking for a candidate or party, no.  No to all other requests he has listed."  (Filing

No. 24-6).

On May 24, 2014, Plaintiff sent a third e-mail to Biehle in which he asked whether

the Policy required him to divest himself of his ownership stake in SocialWorks.

Plaintiff also wrote,

> Based on the written policy and the below response [Barnes' January 31
> message] as well as the narrow allowance for being a poll worker (which,
> outside of a nametag pretty much, allows for no political activity by law), am
> I correct in assuming that anything which could possibly be labeled political
> activity is prohibited?  I'm sorry to have to ask about this again, but I just
> want to know what the appropriate actions are for me to comply with the
> Court Services policy.

(Filing No. 24-7).  Barnes replied on May 29, 2014:

> You are correct that political activity is prohibited, other than voting and
> attending events to hear candidates.  I cannot advise you as to whether active
> participation in your business is prohibited and whether you need to divest
> yourself of your ownership. . . .  You should be guided by the plain wording
> of our policy.

(Filing No. 24-8).  Plaintiff has continued to refrain from engaging in any activity that

could reasonably be deemed "political."  (Plaintiff Aff. ¶ 21).

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).  A motion for preliminary injunctive relief

is analyzed in two distinct phases.  *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th

Cir. 2015).  In the initial, threshold phase, the party seeking injunctive relief bears the

burden of showing that "(1) absent preliminary injunctive relief, he will suffer irreparable

harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Id.* at 661-62.

If the court determines that the moving party has satisfied its burden in the threshold phase, the court proceeds to the second, balancing phase. *Id.* at 662. The court then considers "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted" along with "(5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Id.* In this second phase, the court uses a "sliding scale" to weigh potential harms against the movant's likelihood of success: "the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id.*

## III. Discussion

### A. Likelihood of Success on the Merits

Plaintiff's Complaint alleges that Defendants violated three distinct bodies of law: (1) the First Amendment to the U.S. Constitution, (2) Article 1, Section 9 of the Indiana Constitution, and (3) Indiana Code § 33-23-12-3. However, it appears that Plaintiff has moved for a preliminary injunction based only upon the First Amendment. Indeed, there is no discussion in his briefing of the Indiana Constitution or any Indiana statutes. The court therefore also limits its discussion to the First Amendment. Plaintiff presents three separate claims under the First Amendment: (1) the Policy is facially unconstitutional because it is vague; (2) the Policy is facially unconstitutional because it is overbroad; and

6

(3) the Policy is unconstitutional as applied to Plaintiff.  The court finds that Plaintiff has a high likelihood of success on the merits of his vagueness claim, and therefore declines to opine on the remaining two claims.

## 1.  Void-for-Vagueness Doctrine

"A law or policy is void for vagueness if it 'either forbids or requires the doing of an act in terms so vague that people of common intelligence must necessarily guess at its meaning and differ as to its application.'"  *Ovadal v. City of Madison*, 416 F.3d 531, 535-36 (7th Cir. 2005) (quoting *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926)).  In other words, the government must "articulate its aims with a reasonable degree of clarity," *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984), and ensure any prohibitions are "clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This doctrine exists because "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox TV Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).

The Supreme Court has explained, "The degree of vagueness that the Constitution tolerates -- as well as the relative importance of fair notice and fair enforcement -- depends in part on the nature of the enactment."  *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982).  Thus, a court should consider, among other things, whether the law imposes civil or criminal penalties.  *Id.* at 498-99.  Yet, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.  If, for example, the law interferes with the right of free speech or of association, *a more*

*stringent vagueness test should apply*." *Id.* at 499 (emphasis added).  Indeed, as the

Court previously held, "[I]in the First Amendment area 'government may regulate . . .

only with narrow specificity.' . . . The general test of vagueness applies with particular

force in review of laws dealing with speech." *Hynes v. Mayor & Council of Oradell*, 425

U.S. 610, 620 (1976) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

     "Rigorous adherence" to a high standard of clarity and precision is required in the

First Amendment context in order "to ensure that ambiguity does not chill protected

speech." *Fox TV Stations*, 132 S. Ct. at 2317.  *See Brown v. Entm't Merchs. Ass'n*, 131

S. Ct. 2729, 2743 (2011) ("Vague laws force potential speakers to 'steer far wider of the

unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'"

(quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964))); *Wis. Right to Life, Inc. v.

Barland*, 751 F.3d 804, 835 (7th Cir. 2014) ("*Barland II*") ("Vague or overbroad speech

regulations carry an unacceptable risk that speakers will self-censor, so the First

Amendment requires more vigorous judicial scrutiny.").  Nevertheless, "perfect clarity

and precise guidance have never been required even of regulations that restrict expressive

activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

## 2. The Policy Reaches a Substantial Amount of Constitutionally Protected Conduct

     Before actually examining the alleged vagueness of the Policy, the court must first

consider "whether the enactment reaches a substantial amount of constitutionally

protected conduct." *Hoffman Estates*, 455 U.S. at 494.  *See Ctr. for Individual Freedom

v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (concluding that "both the vagueness and

overbreadth questions involve the same preliminary inquiry"). If the court answers in the negative, "then under either theory the facial challenge must fail." *Id.*

The court has little difficulty in concluding that the Policy reaches a substantial amount of constitutionally protected conduct. The Policy plainly forbids *all* political activity. This ostensibly includes political speech, and yet "political speech is at the core of the First Amendment right." *Barland II*, 751 F.3d at 811. As the Seventh Circuit summarized,

> "There is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs, includ[ing] discus-sion[] of candidates." [*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 754 (2011)] (internal quotation marks omitted). The free flow of political speech "is central to the meaning and purpose of the First Amendment." [*Citizens United v. FEC*, 558 U.S. 310, 329 (2010)]. In our system the individual free-speech right has structural significance; unencumbered discussion about political candidates and issues is "integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 130 S. Ct. at 898.

*Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 151-52 (7th Cir. 2011) ("*Barland I*") (alterations within quotations in *Barland I*).

### 3.  People of Common Intelligence Must Necessarily Guess at the Policy's Meaning

In this case, the court must apply the general vagueness standard with "particular force," *Hynes*, 425 U.S. at 620, and "vigorous judicial scrutiny," *Barland II*, 751 F.3d at 835, because the Policy regulates speech. Under that heightened standard, the prohibitions in the Policy are not "clearly defined," *Grayned*, 408 U.S. at 108, or

articulated with "a reasonable degree of clarity," *Roberts*, 468 U.S. at 629. The court

finds that the Policy is unconstitutionally vague because "[people] of common

intelligence must necessarily guess at its meaning." *Connally*, 269 U.S. at 391.

The Policy purports to bar "political activity," but fails to define that term in any

way. The word "political" is, of course, subject to interpretation. *See Gray v. Toledo*,

323 F. Supp. 1281, 1286 (N.D. Ohio 1971) ("Basically the problem lies with the use of

the words 'political' and 'politics'. Do these words refer to 'the science of government

and civil polity' or are they used in the narrower sense of referring to 'political affairs in

a party sense'?"). Reading the Policy as a whole, the court can only conclusively

determine two things. A Court Services employee: (1) *can* vote, and (2) *cannot* run for or

hold elective office. An employee is left to speculate after that point. For example, while

going door-to-door and asking citizens to vote for a particular candidate is almost

certainly political activity, reasonable people could disagree about whether "liking"

someone's post about a candidate on Facebook is political activity. Similarly, it is

unclear whether attending a primary or general election debate, serving as a poll worker

on Election Day, helping citizens register to vote, signing a nominating petition, or

discussing politics in a public space are considered political activity.

This ambiguity is not just theoretical; it has had a real effect on Plaintiff and

perhaps other Court Services employees. Plaintiff submits that fear of discipline has

forced him to refrain "from any and all activities [he] believe[s] could reasonably be

deemed 'political.'" (Plaintiff Aff. ¶ 21). In other words, Plaintiff has self-censored,

which is precisely the problem that courts seek to avoid. *Barland II*, 751 F.3d at 835.

Importantly, there are no formal mechanisms in place for a Court Services employee to gain clarification on the Policy. *See United States Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973) ("[T]he Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law . . . ."). Further, Defendants have not promulgated any interpretative guidelines that define "political activity." *See Hoffman Estates*, 455 U.S. at 494 n.5 ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."). However, Plaintiff informally asked specific questions about the Policy via e-mail, and Defendants did provide responses. In these responses, Plaintiff learned that, *inter alia*, he *can* "work the polls" on Election Day, but he *cannot* make donations to political campaigns. It is unclear what weight the court should assign to these messages though, as there is no evidence to suggest that their content was published for other employees to read. Thus, it seems that only Plaintiff gained clarification. For all other Court Services employees, the vague Policy, as found in the Employee Handbook, remained in place and un-amended.

Lack of publication notwithstanding, the responses do little to support Defendants' position. First, Barnes' messages are contradictory. In one e-mail, Barnes states that Plaintiff "can work the polls if that means thru [sic] the official duty with the clerk's office." (Filing No. 24-6). Yet, in a subsequent e-mail, Barnes writes, "[P]olitical activity is prohibited, other than voting and attending events to hear candidates." (Filing

11

No. 24-8).  This second message makes no mention of working at a polling center, despite the fact that Barnes had previously stated it was allowed.  This suggests that Defendants are interpreting the Policy inconsistently, which is an inherent problem with vague regulations.  *Cf. Barland II*, 751 F.3d at 835 (noting that vague laws allow for "arbitrary and discriminatory exercise of enforcement discretion").  Also, Barnes' wording of the second message implies that while "attending events to hear candidates" does constitute political activity, it is nonetheless permissible.  Barnes' message is therefore puzzling because the Policy plainly forbids all political activity outside of voting.  Moreover, the second message from Barnes actually highlights the vagueness of the Policy.  In response to Plaintiff's questions regarding whether the Policy required him to divest himself of his ownership stake in his political consulting firm, SocialWorks, Defendant Barnes stated he could not answer the question.

Defendants' only argument on Plaintiff's vagueness claim is that the Policy "is intended to carry out the prohibitions of [the Indiana Code of Judicial Conduct ("ICJC")] Canon 4" and, because "Canon 4 is both lengthy and detailed," the Policy is not unconstitutionally vague.  (Filing No. 25, Defendants' Response at 12).  Invoking the ICJC is problematic for several reasons.  First, there is not a single mention of the ICJC in the Policy.  A Court Services employee cannot reasonably be expected to look to the ICJC for guidance when the Policy does not refer to it.  Second, it appears that this is a *post hoc* argument, developed in response to litigation.  In other words, the first time Plaintiff was told to consult the ICJC was during the briefing on this motion.  Plaintiff

asked for clarification of the policy on several occasions prior to filing this lawsuit, but was never told to consult the ICJC.  (*See* Filing Nos. 24-2, 24-6, 24-8).

Third, even if the Policy did refer to the ICJC, the ICJC does not compel the Policy as Defendants claim.  Initially, Defendants highlight Rule 4.1(B), which states, "A judge or judicial candidate shall take reasonable measures to ensure that other persons do not undertake, on behalf of the judge or judicial candidate, any activities prohibited under paragraph (A)."  Paragraph A of Rule 4.1 prohibits a judge or judicial candidate from, *inter alia*, "mak[ing] speeches on behalf of a political organization," "publicly identif[ing] himself or herself as a member or candidate of a political organization," and "publicly endors[ing] or oppos[ing] a candidate for any public office."  Defendants claim that the "other persons" mentioned in Rule 4.1(B) include judicial employees.  However, as Plaintiff notes, this rule is aimed at "other persons" who are *acting on behalf of a judge*.  In contrast, the Policy does not prohibit political activity only when acting on behalf of a judge.  It simply bars all political activity.  Further, Plaintiff is not seeking to engage in political activity on behalf of the judges of Bartholomew County.

Defendants next point to Rule 2.12(A), which provides, "A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code."  According to Defendants, this means that judges are required to have court staff abide by the same standards imposed on them.  However, the comments to this rule suggest otherwise. Comment 1 explains:

> A judge is responsible for his or her own conduct and for the conduct of others, such as staff, *when those persons are acting at the judge's direction or control*. A judge may not direct court personnel to engage in conduct on the judge's behalf or as the judge's representative when such conduct would violate the Code if undertaken by the judge.

Rule 2.12 cmt. 1 (emphasis added). Thus, Rule 2.12(A), like Rule 4.1(B), is designed to prevent a judge from indirectly violating the ICJC by instructing others to engage in prohibited conduct. Again, the Policy goes beyond the scope of this rule because it does not prohibit political activity only when acting on behalf of a judge.

The rule in the ICJC most applicable to Plaintiff is Rule 4.6(B), one not cited by Defendants. This rule provides, "A judge in an office filled by partisan or nonpartisan election must not permit nonjudicial court employees to run for or hold nonjudicial partisan elective office or to hold office in a political party's central committee." The Policy goes far beyond what is required by this rule.

The court's conclusion herein–that the Policy is unconstitutionally vague–is reinforced by the decision of a sister district court in *Ruff v. City of Leavenworth*, 858 F. Supp. 1546 (D. Kan. 1994). In *Ruff*, police officers filed suit against the City of Leavenworth and its Chief of Police, alleging "the City's personnel policy which seeks to prohibit 'political activity' of City employees . . . is violative of the First Amendment." *Id.* at 1548. The personnel policy provided,

> Employees are permitted to join political organizations, civic organizations, or associations, or other organizations, but are not permitted to personally, individually, or as a representative of said organizations, publicly endorse, solicit or collect campaign funds, or voice public support at public meetings or through the media or by other distributed materials, campaigning for or against candidates for any City elective office. However, employees may participate in informational meetings involving candidates for City elective

14

offices.  The purpose of this prohibition is to prohibit political activities by City employee[s] in City elections of City elective offices.  Employees shall not visibly endorse on their person or City property candidates for any elective office while on duty.

*Id.* at 1550.  In addition to finding the personnel policy unconstitutionally overbroad, the *Ruff* court also held that the policy was unconstitutionally vague.  *Id.* at 1558.  Because there were no "interpretive guidelines or any mechanism through which an employee c[ould] inquire as to the appropriateness of certain conduct in relation to the provision," the court held, "The words of the policy alone . . . [are] not specific enough to afford fair notice or fair warning to the employees of the City of Leavenworth."  *Id.*  The court added, "City employees are left to speculate as to what conduct their employer might consider 'political' or 'campaigning' and what speech regarding City Commission elections their employer might consider 'public.'"  *Id.*  In a footnote, the court summarized the practical concerns with the City's vague policy:

> For example, even if the City could justify prohibiting a formal speech or statement by an employee who is a member of a civic club to that club on the subject of the fitness of candidates for elected city office, under its current wording would the employee also violate the policy if he or she participated in a discussion at a table over luncheon [sic] at the club which touched on that issue?  Would it depend on how many people were at the table?  How loudly the employee spoke?  Whether certain buzz words of endorsement or opposition were used?  How does the employee know when he or she crosses the line--and doesn't that then lead a prudent employee who wishes to avoid censure to simply remain mute?

*Id.* n.18.

After reading the *Ruff* policy, the court can conclusively determine six things. Employees: (1) *can* join political organizations; (2) *can* participate in informational meetings involving candidates; (3) *cannot* publicly endorse candidates; (4) *cannot* solicit

or collect campaign funds; (5) *cannot* voice public support for a candidate; and (6) *cannot* campaign for or against a candidate.  Thus, the *Ruff* personnel policy is far more detailed than the Policy here.  While this court is certainly not bound by *Ruff*, the decision has strong persuasive value in that it is factually similar.  Despite Plaintiff discussing this case in his briefs, Defendants made no attempt to distinguish it.

The instant case is markedly different from *Letter Carriers*, where the Supreme Court rejected an argument that a since-amended prohibition contained in the Hatch Act, which prohibited federal employees from taking "an active part in political management or in political campaigns," was unconstitutionally vague.  413 U.S. at 577.  The Court held that while "[t]here might be quibbles about the meaning of taking an 'active part in managing,'" an "ordinary person exercising ordinary common sense c[ould] sufficiently understand and comply with" the prohibitions.  *Id.* at 577-79.  Similarly, this is not a case where only "the outermost boundaries" of a regulation are "imprecise."  *Broadrick v. Okla.*, 413 U.S. 601, 608 (1973).  Here, an ordinary person exercising ordinary common sense would be forced to guess at what the Policy prohibited.  It is not just the outermost boundaries of the Policy that are vague.

The court therefore finds that Plaintiff has a high likelihood of success on the merits on his facial challenge to the Policy as unconstitutionally vague.  On this basis alone, the court may proceed to examine the remaining preliminary injunction elements. There is no need to address Plaintiff's alternative First Amendment claims.  The court expresses no opinion on Plaintiff's likelihood of success on those claims.

**B. Irreparable Harm, Adequate Remedy at Law, and Balancing the Harms**

To paraphrase the Seventh Circuit, "Here, the analysis begins and ends with the likelihood of success on the merits of the [vagueness] claim.  On the strength of that claim alone, preliminary injunctive relief is warranted."  *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013).  In other words, there is no need for the court to conduct a lengthy analysis on the remaining elements of a preliminary injunction:

> [I]n First Amendment cases, "the likelihood of success on the merits will often be the determinative factor."  *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004).  This is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality opinion), and the "quantification of injury is difficult and damages are therefore not an adequate remedy," *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982).  Moreover, if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.  *Joelner*, 378 F.3d at 620.   Stated differently, "injunctions protecting First Amendment freedoms are always in the public interest."  *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

*ACLU v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012) (footnote omitted).  Regardless, Defendants failed to address any element besides Plaintiff's likelihood of success on the merits, thereby conceding those points.[2]  *Korte*, 735 F.3d at 666.  *See Bonte v. U.S. Bank,*

---

[2] Defendants' only argument outside of the likelihood of Plaintiff's success on the merits is procedural.  Defendants aver that Plaintiff's motion must be denied because he "is trying to alter rather than to preserve the status quo."  (Defendants' Response at 3).  However, the Seventh Circuit recently rejected this same argument: "The State's Attorney argues that a preliminary injunction is inappropriate here because it would grant the ACLU affirmative relief rather than preserving the status quo.  The Supreme Court has long since foreclosed this argument."  *Alvarez*, 679 F.3d at 590 n.1.

*N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). The court finds that Plaintiff will suffer irreparable harm absent injunctive relief, Plaintiff has no adequate remedy at law, and the balance of harms favors injunctive relief.

### C. Scope of the Injunction

Having found that Plaintiff satisfied the elements for a preliminary injunction, the court must enjoin Defendants from enforcing the Policy. Principles of federalism prevent the court from simply drafting a more narrowly tailored policy that it finds reasonable. *Barland II*, 751 F.3d at 833. Nevertheless, invalidating the entire Policy would be inappropriate. According to the Seventh Circuit,

> As facial failings, overbreadth and vagueness render a law totally invalid. Where, however, constitutional overbreadth or vagueness may be cured, "partial, rather than facial, invalidation is the required course, such that a statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact."

*Bell v. Keating*, 697 F.3d 445, 463 (7th Cir. 2012) (quoting *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 329 (2006)) (some quotation marks omitted). Therefore, the Policy will remain in effect only to the extent that it is unambiguous, meaning that Court Services employees will continue to be barred from running for or holding elective office.

### D. Bond

According to Rule 65(c), "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained."  Notwithstanding the plain language of the rule, the Seventh Circuit has explained that a district court may "waive the requirement of an injunction bond" when "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction."  *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).  Put simply, "There is no reason to require a bond in such a case."  *Id.*  In this case, the court is satisfied that Defendants will not suffer any damages if the Policy is enjoined.  Defendants made no argument to the contrary.  Therefore, Plaintiff shall not be required to post a bond.

## IV. Conclusion

The court finds that Plaintiff has satisfied his burden to obtain a preliminary injunction of the Policy, which prohibits Court Services employees from participating in "political activity."  Therefore, Plaintiff's Motion for Preliminary Injunction (Filing No. 23) is **GRANTED**.

Defendants are hereby **ENJOINED** from enforcing the Policy against Court Services employees, except that Court Services employees are still barred from running for or holding elective office.  Plaintiff need not post a bond.

**SO ORDERED** this 6th day of May 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.